UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WILSON RODRIGUEZ,                                  :

                                     Petitioner,          :          01 Civ. 0547 (PAC)

      - against -                                  :          MEMORANDUM
                                                            OPINION & ORDER

LEONARD PORTUONDO,                             :

                                  Respondent.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

Petitioner Wilson Rodriguez ("Rodriguez" or "Petitioner"), an inmate at

Shawangunk Correctional Facility, brings this petition for a writ of habeas corpus pursuant to 28

U.S.C. §2254, challenging a conviction in the New York Supreme Court, Bronx County of

second-degree murder and second-degree criminal possession of a weapon.  Rodriguez is

currently serving a sentence of twenty-five years to life on the murder conviction, with a

concurrent sentence of three and a half to seven years for illegal possession of a weapon.

Rodriguez raises four claims in support of his request for habeas relief:

(1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel;

(3) prosecutorial misconduct with regard to witness testimony; and (4) denial of due process

based on the trial court's failure to suppress unconstitutionally suggestive show-up

identifications of Petitioner that were the result of an illegal arrest.[1]  Respondent seeks dismissal

---

[1] Rodriguez's amended petition, brought through counsel, raises only ineffective assistance of trial
counsel and ineffective assistance of appellate counsel.  The remaining claims come from Petitioner's
original petition, which was filed pro se.  At oral argument, however, Petitioner's counsel made clear that

of the Petition on the ground that none of Petitioner's claims are of constitutional dimension. The Court agrees with Respondent and DISMISSES this petition with prejudice.

## I. BACKGROUND

A. Underlying Offense and Investigation

Petitioner's conviction stems from the shooting death of Onesimo Liz ("Liz") at the corner of 167th Street and Findlay Avenue in the Bronx on the night of March 16, 1992. At the time, Liz was one of six passengers in a car driven by his friend Ray Arroyo ("Arroyo"). (Trial Tr. ("T.") 15, May 16, 1994.) The men had just returned from seeing a movie in Manhattan, and had stopped on Findlay Avenue to discuss which passenger to take home first. (T. 14, 24, 74, 89, 181, 183.) While stopped on the corner, Arroyo and two of his passengers, John Ortiz ("Ortiz") and Alex Rosario ("Rosario"), noticed a man heavily decked in gold jewelry standing on the corner with a female companion. (T. 34-35, 152-59, 439-40.) The group decided that Liz would be dropped off first, so Arroyo began driving in the direction of Liz's home. (T. 49.) Arroyo drove halfway down 167th Street, but then decided to buy something at the store on the corner, so he put the car in reverse and drove back up 167th Street towards the corner he had just left. (T. 49, 108-09.)

When the car returned to the corner, the man with the gold chains yelled towards the direction of the car, "What the fuck are you looking at?" He then pulled out a weapon, aimed toward the back windshield of the car, and fired one shot, hitting Liz in the back of the head. (T. 51-57, 150, 156-57, 234-35, 242-45, 336-37, 345-47.) Arroyo immediately drove towards Lincoln Hospital, but Liz died of his injuries. (T. 57-59, 119, 164, 446, 499, 615-16.) An autopsy revealed that Liz died from a single gunshot wound to the back of the head. (T. 547-48.)

---

it was not abandoning the additional arguments raised in the original pro se petition. Therefore, the Court will address each of Petitioner's arguments.

Detective John McCarthy ("McCarthy") was assigned to investigate Liz's death. (T. 565.) McCarthy interviewed Arroyo and the other occupants of the car. (T. 566-69.) On the second page of the investigative report ("DD-5"), McCarthy noted that none of the occupants could identify the perpetrator, his female companion, or the clothing they wore. (Am. Pet., Ex. A, at 2.) McCarthy's continued investigation revealed that Rebecca Cruz ("Cruz") was the female companion at the scene of the shooting who handed the gun to the shooter. McCarthy visited Cruz on March 19, 1992 and questioned her about the incident, at which time Cruz told McCarthy that Rodriguez was the shooter, gave McCarthy a photograph of Petitioner and informed him of Petitioner's name and address. (T. 571-72.)

B.  Pre-Trial Proceedings

On March 19, 1992, the police arrested Rodriguez in the hallway of his apartment building, based on the information provided by Rebecca Cruz. During the arrest, the officers seized a photograph of Rodriguez from his apartment.[2] After his arrest, the police took another photograph of Rodriguez's hands, which showed Rodriguez wearing several gold rings on his fingers. (Trial Tr. ("T.") 576, 578, May 23, 1994.) At the precinct, Ineabella "Mindy" Santiago ("Santiago"), who was on the corner of 187th Street and Findlay Avenue with Rodriguez prior to the murder but did not witness the shooting, viewed Rodriguez through a one-way mirror, and identified Rodriguez as the man on the corner. (Hearing Tr. ("W.") 11, 13, Apr. 19, 1994.) McCarthy then brought Cruz back to the precinct to identify Rodriguez. (W. 7-8.) After viewing Rodriguez through a one-way mirror, Cruz identified Rodriguez as the shooter. (W. 8-9.)

---

[2] There is some confusion as to whether police officers did, in fact, confiscate a photograph from Petitioner's apartment. (T. 3-5.) It appears that the photograph to which Petitioner refers is actually the picture Cruz gave to McCarthy earlier that same day.

On April 20, 1992, a Bronx County grand jury returned a multiple count indictment of Petitioner, charging him with murder in the second degree, manslaughter in the first degree, criminal possession of a weapon in the second, third and fourth degrees, and reckless endangerment in the first degree. (Indictment No. 2920/92.)

Petitioner's counsel moved to suppress the photograph and the confirmatory identification by Cruz and Santiago at the police precinct as the fruits of an illegal arrest. The Court held a Wade/Payton hearing on April 19, 2004. (W. 1.) Based on the evidence presented at the hearing, the court found that Petitioner had been illegally arrested in his home, without a warrant or exigent circumstances. (W. 190.) Accordingly, the court suppressed the photograph seized from Petitioner's apartment as a result of the unlawful warrantless arrest.[3] (Id.; T. 5.) The court refused, however, to suppress the confirmatory identifications by Cruz and Santiago. The court rejected defense counsel's argument that the precinct show-ups used to identify Petitioner were per se unconstitutional, finding that because both Cruz and Santiago knew Petitioner prior to the shooting,[4] their identifications of Rodriguez were confirmatory, and therefore were admissible. (T. 3-6.)

C. Trial and Conviction

Trial commenced before Justice Dominic Massaro of the Bronx County Supreme Court on May 16, 1994. (T. 1.) Officers never recovered the gun and no physical evidence existed linking Petitioner to the scene of the crime, so the prosecution's entire case turned on eyewitness testimony. In total, the prosecution called five eyewitnesses: Cruz and Santiago, the

_____

[3] While the trial court did not clarify after the Wade hearing whether it was suppressing both the photograph seized from the apartment and the photograph taken at the precinct, the court clarified before trial that its suppression ruling applied to "seized" photograph only. (T. 5.)

[4] Cruz had known Petitioner for approximately one and half years prior to the shooting, and had given the police Petitioner's name, address and photograph prior to Petitioner's arrest. Rodriguez, a friend of Cruz, met Petitioner earlier on the day of the shooting, and then spent time with him that evening before the shooting. (T. 224, 392-94.)

occupants of the car in which Liz was riding when he was shot, and a man who witnessed the shooting while using a public pay phone.

The first witness called by the prosecution was Arroyo, the driver of the car in which Liz was killed. (T. 11.)  Arroyo testified that his car remained on the corner of 167th Street & Findlay Avenue for approximately two or three minutes before it pulled away. (T. 25.)  During that time, he noticed "a female that he recognized" standing on the corner with "a short girl and a guy," neither of whom he had seen before.[5] (T. 25-26, 32.)  He described the male companion as Hispanic, approximately 5'9", and wearing lots of gold jewelry, including rings on both hands and approximately six chains. (T. 33-35, 46.)  Arroyo was unable to identify Petitioner as the shooter. (T. 47-48.)

Upon cross-examination, Arroyo admitted that he did not tell police that he had seen the shooter. (T. 72-73.)  Arroyo also admitted that he had no recollection of giving McCarthy —or any other officer—the information contained in the DD-5 report. (T. 120-23.)  Defense counsel read only from the first page of the DD-5 report, and did not read out loud the statement contained on the second page of the DD-5 report that Arroyo could not "ID the perp or females or clothing they wore." (Am. Pet., Ex. A., at 2.)  In fact, when the DD-5 report was handed to Arroyo to refresh his recollection,[6] the prosecution interjected:

| Prosecution: | Your Honor, the witness is now reading from the second page.  I don't know if that was intended by defense counsel. |
|---|---|
| Defense: | I believe it continued on the second page. |
| Prosecution: | No, it does not. |

---

[5] Arroyo testified that at the time he did not know the girl's name, but he had seen her on approximately three occasions. (T. 27-30.)

[6] Defense counsel read an excerpt from McCarthy's DD-5 to Arroyo on cross examination, but incorrectly referred to 167th Street as 116th.  When the error was pointed out, it was suggested that Arroyo read the DD-5 himself.  The colloquy deals with whether the extract of the report that was read was all on one page of the DD-5 or whether it continued on to the second page.  (T. 120-122.)

(T. 122.)  Defense counsel did not question this statement or further utilize the DD-5 when cross-examining Arroyo or any other prosecution witness.

The prosecution later called the other occupants of the vehicle as witnesses.[7] John Ortiz, who sat in the front passenger seat, testified that he saw two females and one male on the corner, and the male wore a black leather jacket, black pants and many gold rings and chains. (T. 151-52, 159.)  He also testified that the shooter had "a nice haircut" and stood between 5'8" and 5'10" tall. (T. 152, 159.)  Ortiz then positively identified Petitioner as the shooter. (T. 159, 191-92.)  Anthony Garcia, who was in the back seat with Liz, could not identify the shooter or his clothing.  Alex Rosario, who was also in the back seat, could not identify the Petitioner in court, but remembered that the shooter had a great deal of gold jewelry and a black leather jacket. (T. 389.)  Defense counsel did not impeach any of these witnesses with their prior statement, contained in McCarthy's DD-5 report, that immediately after the shooting they were unable to identify the shooter, his female companions, or the clothes they wore.

Cruz and Santiago both testified for the prosecution.  Cruz testified that she had known Petitioner for approximately a year and a half before the incident and that Santiago was her sister-in-law. (T. 224-25.)  She explained that immediately before the shooting, she was hanging out with Santiago and Rodriguez on the corner of 167th Street & Findlay Avenue when a car pulled up. (T. 227-28, 230, 232.)  The occupants of the car were looking at Cruz and Rodriguez and they "looked like they were going to come out of the car to do something," so Rodriguez demanded his gun, which Cruz was holding. (T. 232, 234-35.)  When Cruz refused,

---

[7] The back-seat passenger known only as "John" could not be located and did not testify at trial.

Rodriguez took the gun from her and shot directly at Arroyo's car. (T. 234-35.)  The two then fled the scene in a cab.[8] (T. 235.)

Santiago testified that she was with Cruz and Santiago on 167th Street & Findlay Avenue immediately before the murder, but she did not witness the shooting because she was in a store at the time that it happened.  Santiago explained that she met Rodriguez for the first time earlier in the day on March 16, 1992, at approximately 1:00 p.m. (T. 391-92.)  The two spoke for approximately ten minutes, and then Rodriguez gave Santiago his beeper number so that she could call him in the future. (T. 392, 394.)  Santiago met up with Cruz and Rodriguez later that same evening on Elliot Place in the Bronx. (T. 397.)  The three walked to Santiago's mother's house to drop off her son, and then walked to 167th Street & Findlay Avenue. (T. 397-98)  Once at 167th Street & Findlay Avenue, Santiago went in and out of the store on the corner looking for her friend Evelyn, while Cruz and Santiago waited outside. (T. 402.)  Santiago was inside the store when the fatal shot was fired, and when she exited the store she did not see Rodriguez on the corner. (T. 403-04.)

The prosecution also called Michael Justin Adams ("Adams") as an identification witness.  Adams had no prior knowledge of the defendant, his female companions, or the occupants of the car; he happened to be using a public payphone at the corner of 167th Street & Findlay Avenue at the time of the shooting. (T. 324-25.)  When Adams first approached, Cruz and Santiago were using the phone to wish someone a happy birthday. (T. 327-28.)  When they hung up, Adams picked up the phone. (T. 328-29.) Santiago returned to the store, and Cruz and Rodriguez remained on the corner, only a few steps from where the public payphone was located.

---

[8] In the cab, Rodriguez gave Cruz the gun for safekeeping, but Cruz returned the gun to Rodriguez later the same day. (T. 236.)

While on the telephone, Adams observed a car driving south on Findlay Avenue. He thought the car was driving in an unusual manner, as it had stopped at the corner, backed up, then stopped again and returned to the corner, so he took note. (T. 363.) As the car proceeded towards the intersection, the man on the corner looked afraid, and yelled "what the fuck are they looking at!" (T. 329, 334.) The man then grabbed a gun from the pants of his female companion and put the gun in his pants. (T. 335-36, 345-46.) He again yelled towards the car "what the fuck are you looking at," then pulled the gun from his pants, aimed "point blank" at the back windshield, and fired one shot. (T. 346.) Adams positively identified Rodriguez as the shooter and Cruz as his female companion. (T. 326, 334.) Like the occupants of the car, Adams noticed that the man on the corner was draped in gold jewelry, with multiple gold rings on his fingers and chains around his neck. (T. 335-36.)

The last two witnesses for the prosecution were the medical examiner, who testified about the circumstances of Liz's death, and McCarthy, who testified about his investigation leading to Petitioner's arrest. On cross-examination, defense counsel did not ask McCarthy about his DD-5 report.

The defense called only one witness: Police Officer John Mondello, one of the officers who first encountered Arroyo's vehicle on the way to Lincoln Hospital. Mondello testified that sometime after 11:00 p.m. on March 16, 1992, he and his partner observed a car, packed full of people, speeding the wrong way down Teller Avenue in the Bronx. (T. 615-18.) He testified that after escorting the car to Lincoln Hospital, he searched the occupants of the car and the car itself for a weapon, but did not find one. (T. 620-21, 623.) Defense counsel attempted to establish that originally Officer Mondello believed there were only five, rather than six, occupants in the car, and got Officer Mondello to admit that he did not know if one of the

original occupants of the car "hopped out of the car" before officers arrived at the scene. (T. 616-18, 624.)

After Mondello's testimony, both sides rested and the defense moved to dismiss all counts in the Indictment for failure to establish a prima facie case.[9] Defense counsel focused particularly on the depraved murder count, arguing that the evidence suggested a case of self defense, which requires intent, and did not support a case of depraved indifference murder. The Court ruled that whether Petitioner acted intentionally or with deliberate indifference was a jury question, and denied defense counsel's motion in full.

Summations were held on May 25, 1994, following which the trial court charged the jury. On May 26, 1994, the jury returned its verdict. The jury found Petitioner guilty of murder in the second degree, depraved indifference, and criminal possession of a weapon in the second degree.[10] On July 11, 1994, the court sentenced Petitioner to a prison sentence of 25 years to life. (Sentencing Tr. 14, July 11, 1994.)

---

[9] Previously, the Court held a charging conference. The court expressed its intent to include a charge addressing the show-up identifications of Cruz and Santiago, particularly, a statement regarding the necessity of, and any suggestiveness that might have been incurred in, the identifications. (T. 649-52.) As to the substantive crimes and defenses, the parties agreed to charge the jury as followings: The first count would be murder in the second degree, intentional murder; the second count would be murder in the second degree, depraved indifference, with the lesser included offense of recklessness under 125.15(1); the third count would be manslaughter in the first degree; the fourth count would be criminal use of a firearm in the first degree; and the fifth count would be criminal possession of a firearm in the second degree. The Court denied defense counsel's request for a jury instruction that Cruz was an accomplice as a matter of law or that it was up to the jury to determine whether Cruz was an accomplice. (T. 664.)

[10] Interestingly, given the facts of this case, Petitioner's conviction for depraved indifference rather than intentional murder, is questionable. See People v. Suarez, 6 N.Y. 3d 202 (2005); Policano v. Herbert, 430 F.3d 82 (2d Cir. 2005). Petitioner himself recognized this tension when he requested leave from this Court to extend the stay of this case so that he could add an additional claim for ineffective assistance of counsel based on People v. Gonzalez, 1 N.Y. 3d 466 (2004). While Petitioner raised this argument in his coram nobis petition to the state court as a ground for ineffective assistance of appellate counsel, Petitioner did not raise this issue in his renewed petition. Since Petitioner does not raise this issue in his petition, the Court will not address it.

D. Post-Conviction Motions and Appeals

Rodriguez took a timely appeal of his conviction to the Appellate Division, First Department ("Appellate Division"). On appeal, Rodriguez was represented by a law student from the Cardozo Appeals Clinic. She raised only one issue in her appeals brief: the precinct show-up identifications were unconstitutionally suggestive and were the fruits of a Payton violation. On February 27, 1997, the Appellate Division affirmed Rodriguez's conviction, finding that the identifications were confirmatory and that "any error in the court's ruling was harmless beyond a reasonable doubt." People v. Rodriguez, 236 A.D.2d 332 (1st Dep't 1997). Rodriguez sought leave to appeal to the New York Court of Appeals, but his request was denied by summary order on May 27, 1997. People v. Rodriguez, 89 N.Y.2d 1099 (1997).

On July 30, 1998, Rodriguez, acting pro se, moved in the Bronx County Supreme Court to set aside his conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10. Rodriguez raised six grounds for set aside in his motion: (1) the prosecutor gave false testimony to the jury; (2) the prosecutor illegally submitted to the jury a photograph that the trial judge had already deemed admissible at the pre-trial Wade/Payton hearing; (3) trial counsel was ineffective for (a) not attempting to locate a potential witness, (b) not objecting to the late receipt of Rosario materials; (c) not impeaching prosecution witnesses with the prior inconsistent statement contained in the police report, (d) using dual strategies without the knowledge or approval of defendant; and (e) preventing defendant from testifying on his own behalf.

On February 18, 2000, the trial court denied Rodriguez's CPL § 440.10 motion without explanation. On March 27, 2000, Rodriguez applied to the Appellate Division for leave to appeal the trial court's denial of his CPL § 440.10 motion. On June 22, 2000, the Appellate Division denied Rodriguez's application without opinion. People v. Rodriguez, 2000 N.Y. App. Div. LEXIS 7935 (1st Dep't June 22, 2000). On July 21, 2000, Rodriguez sought leave to

reargue, but this motion was also denied by the Appellate Division without opinion on September 14, 2000. <u>People v. Rodriguez</u>, 2000 N.Y. App. Div. LEXIS 9692 (1st Dep't Sept. 14, 2000).

## II. PROCEDURAL HISTORY

Rodriguez filed this petition for writ of habeas corpus <u>pro se</u> on October 10, 2000. His original petition raised three grounds for habeas relief: (1) ineffective assistance of trial counsel; (2) prosecutorial misconduct with regard to witness testimony; and (3) denial of due process based on the failure to suppress unconstitutionally suggestive police-arranged precinct show-ups that were the result of an illegal arrest.

On November 25, 2003, Petitioner sought leave to add an additional claim for habeas relief that was not asserted in the original petition, and had never been presented in state court. By Order dated December 9, 2003, Judge Lynch granted Petitioner permission to file a § 440.10 motion in state court and granted a stay of this petition so that Rodriguez could exhaust these new claims in state court.

On May 10, 2004, Rodriguez again wrote the court seeking an extension of the stay so that he could add an additional claim for ineffective assistance of appellate counsel based on <u>People v. Gonzalez</u>, 1 N.Y.3d 446 (2004), a case dealing with intentional and depraved indifference murder.  By Order dated May 13, 2004, Judge Lynch granted this additional extension, provided that Rodriguez filed his motion for a writ of error <u>coram nobis</u> with the Appellate Division by July 16, 2004.  Judge Lynch also directed that upon completion of review by the New York courts, Rodriguez renew this petition within thirty days and formally request that the petition be amended to include the claims raised in his <u>coram nobis</u> motion.

Rodriguez made a timely application to the Appellate Division, First Department for a writ of error <u>coram nobis</u>, which was denied without opinion on December 2, 2004.

Pursuant to Judge Lynch's prior order, Rodriguez renewed his petition on June 1, 2005 and sought leave to amend the petition to include the claims raised in the coram nobis motion.[11] By Order dated June 7, 2005, Judge Lynch permitted the amendments requested by Petitioner, vacated the stay, and ordered Respondent to answer. Interestingly, while Rodriguez's amended petition argues ineffective assistance of appellate counsel, it does not raise the People v. Gonzalez depraved versus intentional murder issue that prompted the additional stay in the first place. Because this issue was not renewed, as required by Judge Lynch's prior Order, the Court considers the issue waived.

### III. DISCUSSION

A. Exhaustion in State Court

A federal court may not consider a petition for a writ of habeas corpus unless the petitioner first exhausts all available state court remedies as to each of his claims. See 28 U.S.C. § 2253(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275 (1971); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997). Substantively, a petitioner must raise a federal or constitutional claim in state court and must inform the state court of "both the factual and the legal premises of the claim [he] asserts in federal court." Rodriguez v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (quoting Daye v. Attorney Gen., 696 F.2d 186, 191 (2d Cir. 1982) (en banc)). Procedurally, a petitioner must pursue his claim through all levels of appeal in the state court system, so that eventually he "present[s] the substance of his federal claims 'to the highest court of the pertinent state.'" Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (quoting Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990)).

---

[11] While Petitioner originally filed this habeas petition pro se, his June 1, 2005 renewal was filed by counsel, Abraham Abramovsky, Esq.

Petitioner has exhausted all but one of his claims: his claim that appellate counsel was ineffective because she failed to argue trial counsel's ineffectiveness based on his failure to impeach three prosecution witnesses with the prior inconsistent statement contained in McCarthy's DD-5 report.[12]  Respondent correctly points out that this argument was not raised in Petitioner's pro se coram nobis application, and therefore the claim has not been properly considered in the state courts.  In an effort to bring finality to this matter, however, the Court examines the merits of this claim despite Petitioner's failure to exhaust it.  See 28 U.S.C. § 2254(b)(2) (stating only that a federal habeas court may not *grant* an unexhausted claim on the merits).

B. Merits of Petitioner's Claims

Under The Antiterrorism and Effective Death Penalty Act ("AEDPA"), the court may issue a writ of habeas corpus only if  the adjudication on the merits in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); see Williams v. Taylor, 529 U.S. 362, 412 (2000) (quoting 28 U.S.C. § 2254(d)(1)); Shabazz v. Artuz, 336 F.3d 154, 160-61 (2d Cir. 2003).

The "contrary to" clause means that the writ may be granted only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A federal

---

[12] Petitioner also raised a claim for ineffective assistance of appellate counsel based on a theory that appellate counsel, a law student representing Petitioner through a law school clinical program, had exceeded the bounds of the practice order governing the use of law students on appellate briefs. Petitioner's counsel suggested at oral argument, however, that it was abandoning this limited claim, so the Court need not address it.  If it were to do so, however, the Court would find that the claim lacked any merit, both because the brief filed was in compliance with the applicable practice order and because Petitioner consented to student representation. (See Respt.'s Mem. Law Opp'n, Exs. 21 & 22.)

district court may grant habeas corpus under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme] Court's opinions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Thus, the district court may not grant a habeas corpus petition simply because the state court's decision was, in the mind of the district court, *incorrect*; instead, the state court's decision must be objectively *unreasonable*. This Court must determine whether the outcome—regardless of the rationale—is contrary to, or involved an unreasonable application of, Supreme Court precedent. See Eze v. Senkowski, 321 F.3d 110, 123 (2d Cir. 2003) (emphasis added) (internal quotation marks omitted).

### 1. Ineffective Assistance of Trial Counsel

Ineffective assistance of counsel claims are analyzed under the two-part test set forth in Strickland v. Washington. See 466 U.S. 668, 687-88 (1984); Lynn v. Bliden, 443 F.3d 238, 245-46 (2d Cir. 2006). First, the court must determine whether petitioner's counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Id. at 687. A court applying Strickland "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 702 (2002). Second, the court must then determine if counsel's alleged errors were so serious that they prejudiced the defendant, i.e., that there is a "reasonable probability" that in the absence of counsel's errors, the outcome of the proceeding would have been different. See Kyles v. Whitley, 514 U.S. 419, 434, 533 (1995). While a Petitioner need not demonstrate by a preponderance of the evidence that but for counsel's errors the petitioner would have been acquitted, he must raise a legitimate doubt as to whether, in the absence of counsel's error, the outcome would have been the same. Strickland,

466 U.S. at 687.  A failure to make either showing is fatal to an ineffective assistance of counsel claim.[13]  Id. at 697.

Under 28 U.S.C. § 2254(d)(1), it is not enough for Petitioner to demonstrate that the state courts applied Strickland incorrectly in his case.  Rather, Petitioner must show that the state courts' application of Strickland was objectively unreasonable.  See Bell, 535 U.S. at 698-99.  This court's ability to analyze the state courts' application of Strickland under the "unreasonable application" standard is complicated, however, by the fact that the state courts entered judgment without opinion. As a result, this Court has no insight into the state courts' reasons for deciding as they did.  The Second Circuit has said that where a state court "reject[s] in bulk undiscussed—and perhaps unlisted—claims ... no AEDPA deference by the district court on these claims [i]s warranted." Rudenko v. Costello, 286 F.3d 51, 71 (2d Cir. 2002).  Therefore, the "unreasonable application" standard may not apply in this case.  It is unnecessary to determine which standard applies here, however, as Petitioner's claim lacks merit under either the AEDPA "unreasonable application" test or de novo review.

Petitioner argues that his counsel made multiple errors: (1) failing to locate a witness; (2) utilizing dual trial strategies—misidentification and justification—without Petitioner's knowledge or consent; (3) preventing Petitioner from testifying at trial, despite his

---

[13] The Strickland Court explained:

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.

Strickland, 466 U.S. at 697.  Therefore, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," without an extended examination into the reasonableness and competency of counsel's performance, "that course should be followed." Id.

willingness to do so; and (4) failing to use a prior inconsistent statement, which was readily available and contained in the original police report of the incident, to impeach the prosecution's witnesses during cross examination.[14]  Petitioner suggests that these errors, either individually or in the aggregate, amounted to ineffective assistance of counsel.  The Court disagrees and finds that none of the errors alleged by Petitioner amount to a violation of the Sixth Amendment under Strickland.

### (a)  failure to locate a witness

At the time of the shooting, there were six occupants in Arroyo's car: Arroyo, Ortiz, Rosario, and Garcia, all of whom testified for the prosecution, Liz, the deceased, and a man known only as "John."  None of the other occupants of the vehicle knew "John's" last name, address, or whereabouts from the day of the murder until the time of the trial.  Petitioner contends that defense counsel's failure to investigate the identity of "John," the fifth passenger in Arroyo's car, and locate this witness before trial amounted to ineffective assistance. (Orig. Pet. at 5-B).  The Court finds no support for Petitioner's claim.  Petitioner has no idea why "John" did not testify for the prosecution, or what "John" would have said if he had been called to testify.  In light of the fact that the other four occupants of the car testified for the prosecution, there is no reason to believe that "John" would have provided testimony favorable to the defense.

Furthermore, in light of the fact that no one knew "John's" last name or address, there was little chance that defense counsel could have located "John" prior to the trial.  Petitioner's suggestion that "John's" testimony would have been exculpatory is sheer speculation

---

[14] Petitioner raises all four alleged errors in his original pro se petition.  His June 1, 2005 renewed petition, brought through counsel, focuses only on the fourth argument—ineffective assistance of counsel based on defense counsel's failure to impeach the occupants of the car with the prior inconsistent statement contained in McCarthy's DD-5.  Petitioner's new counsel made clear at oral argument, however, that Petitioner does not abandon the other arguments.  Accordingly, this Court will address all four claimed errors Petitioner raises in support of his claim of ineffective assistance of counsel.

and it does not make counsel's failure to locate this witness unreasonable, nor does it raise legitimate doubt as to the outcome of the trial. See, e.g., Morales v. United States, 199 F.3d 1322 (2d Cir. 1999) (finding defendant's conclusory assertions that unidentified witnesses were available and willing to testify at trial for the defense insufficient to support ineffective assistance of counsel claim); United States v. Vargas, 920 F.2d 167, 170 (2d Cir. 1990) (finding that petitioner's affidavit that witness would have provided exculpatory testimony insufficient to render attorney's decision not to call witness unreasonable). Accordingly, Petitioner fails to show that defense counsel's failure to investigate the identity of "John" and locate him prior to the trial as a potential witness for the defense amounts to ineffective assistance in violation of the Sixth Amendment.

*(b) utilizing dual trial strategies*

In his closing statement, defense counsel argued first that this was a case of misidentification; Petitioner was not at the scene of the incident and did not commit the crime. (T. 682-83). Counsel then went on to tell the jury that if they *did* find that Petitioner was the shooter, they should consider that the killing may have been justified based on self-defense. (T. 683-85). Petitioner claims that prior to the summations, he had informed defense counsel that he did not want counsel to set forth the self-defense argument but that counsel ignored his request and pursued alternative theories nonetheless. (Orig. Pet. at 5-B). Petitioner argues that defense counsel's decision to put forth both theories, in direct disregard for Petitioner's request that he not pursue both strategies, amounts to ineffective assistance of counsel. (Orig Pet. at 5-B).

Petitioner's argument fails for two reasons. First, the trial transcript reveals that Petitioner advised his counsel to advance both theories. Immediately before closing arguments,

defense counsel made the following statements in open Court in the presence of the Petitioner (jury not present):

> Now, yesterday my client indicated that he did not want me to request the right to use deadly physical force to repel a robbery. He did not want me to argue that in the event the jury rejects the defense of mistaken identification, that he was then acting in his own defense.
> . . .
> However, he has apparently reflected upon this and he chooses to have me interpose the following defense in summation: One, he was not there, the case is one of mistaken identification. If despite the fact that the evidence clearly indicates a reasonable doubt as to whether he was there the jury should . . . decide that he was there, we will then argue that whoever the shooter was, that he was acting in self defense and the jury finds it was the defendant, he was acting in self defense.
> . . .
> I should add that in reaching his decision the defendant again has been counseled by me. I have given him my best thoughts. Obviously, there are tactical questions in which people disagree and I've explained that to him, too. I've also explained the fact that sometimes when you use alternative defenses you might even run the risk of losing credibility with the jury, but that is the route my client and I have decided to take . . . I am sure you understand there is so much at stake the defendant certainly has the right to change his mind.

(T. 641-42.) This suggests that Petitioner is not being wholly candid with the Court now. Rather, it appears that Petitioner fully consented to, if not encouraged, his counsel's trial strategy. Having chosen a certain route, Petitioner must live with the consequences. He cannot choose to follow a certain path and then claim that his lawyer's theories and arguments were incompetent.

Regardless, counsel's decision to pursue alternative defenses in his summation was not unreasonable. In light of the large amount of evidence supporting Petitioner's guilt, it was not unwise for defense counsel to argue self-defense in his closing statement. This was an "exercise of reasonable professional judgment," and therefore does not amount to ineffective assistance of counsel. See Strickland, 466 U.S. at 690. The fact that this strategy did not result in

an acquittal does not, with the benefit of hindsight, render counsel's decision to advance it unreasonable. Id. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

*(c) preventing Petitioner from testifying at trial*

Petitioner now claims that defense counsel's advice that Petitioner not testify on his own behalf at trial was ineffective and lacked any trial strategy. (Orig. Pet. at 5-C, 5-D). The Court does not agree. Counsel's advice that Petitioner refrain from taking the stand in his own defense reflects sound trial strategy and therefore cannot be deemed ineffective under the Strickland test. If Petitioner had taken the stand, Petitioner would have opened the door to impeachment evidence of his prior felony conviction. See Fed. R. Evid. 609(a)(1). Defense counsel wisely decided that such questioning risked weakening Petitioner's case and therefore advised Petitioner against testifying on his own behalf. Such a decision falls squarely within prevailing professional norms.

In addition, Petitioner has not explained how he was prejudiced by his failure to testify at trial. Petitioner's primary defense was mistaken identity. Counsel argued in his closing that Petitioner was "not even there", i.e., not on 167th Street and Findlay Avenue at the time of the shooting. (T. 670) Petitioner has not explained, and the Court cannot fathom, what Petitioner could have said to bolster this defense. If Petitioner had an alibi that he wanted to convey to the jury, Petitioner could have brought this alibi to light through the use of alibi witnesses or admissible physical or documentary evidence, without ever taking the stand.[15] Thus, the Court

---

[15] This observation is hypothetical, as there is no evidence whatsoever that Petitioner had an alibi for the night of March 16, 1992.

sees no prejudice resulting from Petitioner's failure to take the stand. As such, Petitioner's claim fails both prongs of the <u>Strickland</u> test.

<em>(d) failing to use the DD-5 to impeach the prosecution's witnesses</em>

Finally, Petitioner argues that defense counsel's failure to impeach the occupants of the car with the prior inconsistent statement contained on page 2 of the DD-5 report was both incompetent and prejudicial, and therefore amounts to ineffective assistance of trial counsel. Petitioner is correct that failure to impeach key witnesses may, in some circumstances, rise to the level of ineffective assistance. <u>See e.g.</u>, <u>Eze</u>, 321 F.3d at 137; <u>Harris v. Artuz</u>, 288 F.Supp.2d 247, 260 (E.D.N.Y. 2003) (holding that defense counsel's failure to impeach a prosecution witness with medical evidence that he was stabbed, rather than shot, was sufficiently incompetent and prejudicial to it amounted to ineffective assistance of counsel); <u>Harris v. Senkowski</u>, 298 F.Supp.2d 320, 337 (E.D.N.Y. 2004) (finding trial counsel's failed to impeach an identification witness amounted to ineffective assistance of counsel). Whether counsel's failure to impeach violates the Sixth Amendment depends upon the extent to which the impeachment evidence would have affected the outcome of the case, however, and not every failure to impeach a prosecution witness will support an ineffective assistance claim. <u>See e.g.</u>, <u>Lynn</u>, 443 F.3d at 245-46 (holding that defense counsel's failure to impeach an identification witness with a prior inconsistent statement that he "couldn't recognize" the perpetrator did not constitute deficient performance under <u>Strickland</u>, and denying petitioner's habeas petition). In this case, defense counsel's failure to use the DD-5 to impeach the occupants of the vehicle does not rise to the level of ineffective assistance, as the existence of three other identification witnesses suggests that counsel's failure to impeach did not prejudice the outcome of the trial.

When interviewed by McCarthy immediately after the shooting, all of the occupants of the vehicle in which Liz was killed claimed that they were unable to identify the

shooter or the clothes he wore. (Am. Pet. at 8). This statement is embodied on page 2 of the DD-5 police report: "none of the above witnesses can ID the perp or females or clothing they wore." (Am. Pet, Ex. A.). Despite this statement, at trial Ortiz positively identified Petitioner as the shooter. (T. 159.) Similarly, while neither Arroyo nor Rosario identified Petitioner, each gave testimony identifying the shooter's gold jewelry.[16] (T. 34-37, 46, 439-40.)

Defense counsel did not cross-examine Arroyo, Ortiz or Rosario with the second page of the DD-5. In fact, when questioning Arroyo on his recollection of the DD-5 report, defense counsel may have been confused by the prosecutor's suggestion that the excerpt from the DD-5 was on a single page, and did not continue to the second page where the impeaching material was contained. (T. 122.) As a result, counsel lost the opportunity to impeach these witnesses and discredit their identification testimony.[17] This was negligent, according to Petitioner, because the entire trial hinged on the identity of the shooter, which in turn hinged on the testimony of identification witnesses. Had defense counsel only used the prior inconsistent statement to discredit Arroyo, Ortiz and Rosario, the argument continues, the jury likely would have had reasonable doubt as to Petitioner's guilt. While Petitioner recognizes that three other identification witnesses—Cruz, Santiago and Adams—testified for the prosecution, each of whom saw Rodriguez up close at the time of the shooting, Petitioner asserts that their credibility was already questionable, and therefore there is a reasonable probability that the jury would have reached a different conclusion had these additional inconsistencies been elucidated at trial. (Id. 29-31).

---

[16]  Garcia, who was in the back seat with Liz, also testified for the prosecution, but he was unable to identify Petitioner or his clothing.

[17]  It is not entirely clear that the colloquy misled defense counsel in any way. See supra note 6. In his first question on cross-examination, defense counsel established that Arroyo had not told police that he had seen the person who shot his friend. (T. 72-73.) Since he had already established that fact, counsel may have deliberately chosen not to use the DD-5, which said that Arroyo could not identify the shooter.

The Court agrees with Petitioner that in hindsight defense counsel should have attempted to impeach Ortiz, Arroyo and Rosario with the statement contained in the DD-5 report that none of the witnesses in the car could identify "the perp or the females or the clothes they wore." The Court need not evaluate defense counsel's strategy in depth, however, because the Court does not believe that this deficiency altered the outcome of the trial.

Arroyo, Ortiz and Rosario were not the only witnesses for the prosecution. At trial, Cruz and Adams also identified Petitioner as the shooter. Indeed, Cruz provided detailed testimony about how Rodriguez took the gun from her immediately before the shooting. In addition, Santiago testified that Petitioner was at the corner of 167th Street & Findlay Avenue with Cruz immediately before the shooting, thereby placing Petitioner at the scene of the crime and corroborated Cruz's testimony.

Furthermore, Cruz and Santiago both had a cordial relationship with Petitioner. Cruz knew Petitioner for a full year and half prior to the shooting; Santiago had conversed with Petitioner earlier that day, and had even brought him to her mother's house just before the shooting. (T. 392-97.) Clearly they knew one another, making each woman's identification of Rodriguez particularly reliable. Adams, who was a complete stranger who happened to be using a phone on the corner of 167th and Findley, testified that he saw Cruz, Santiago and Rodriguez standing on the corner. He saw Rodriguez take the gun from Cruz and shoot it into the car. (T. 336-337, 344-347.) Thus, a reasonable jury could easily have found that Petitioner was the perpetrator based on the testimony of Cruz, Santiago and Adams alone, without considering any of the passengers' testimony.

Petitioner attacks Cruz's testimony as unreliable because Cruz was a self-interested witness. In sum, when Detective McCarthy questioned Cruz on March 19, 1992, he threatened that police knew Cruz had a gun, and therefore Cruz could be prosecuted if she did

not cooperate. Cruz then gave McCarthy Petitioner's name, address and photograph. According to Petitioner, this raised doubt as to whether Cruz's identification of Petitioner as the shooter was truthful, or done to avoid jail time. Similarly, Petitioner argues that Santiago's testimony was also unreliable because Santiago and Cruz were related.[18] Therefore, it was possible that Santiago put Petitioner at the scene of the crime in order to protect Cruz. Finally, Petitioner argues that Adams, a disinterested observer, was distracted while the shooting took place because he was on the telephone; therefore, his testimony was unreliable. (Pet. Mem. at 30). Thus, the only "reliable" witnesses were Arroyo, Ortiz and Santiago. If defense counsel had impeached these three witnesses with the DD-5, there would not have been any reliable witnesses, which would have created reasonable doubt as to Petitioner's guilty.

Of course, this argument requires the suspension of reality. Cruz, Santiago and Adams all gave substantially similar accounts of what happened. Their combined testimony provided ample assurance that their testimony was truthful. It is not possible for a reasonable juror to find that Cruz lied to protect herself, and Santiago lied to protect Cruz, when a completely disinterested observer gave an almost identical account of the events leading up to the shooting. In light of this, a reasonable jury could find on the testimony of Cruz, Santiago and Adams alone that Petitioner was guilty, even if the jury completely discounted the testimony of Arroyo, Ortiz and Rosario. There is no reason to believe that impeaching these latter witnesses with the DD-5 would have made any difference in the outcome of the trial. Therefore, even if counsel's performance fell below an objective standard of reasonableness, Petitioner has failed to establish that counsel's errors constitute ineffective assistance of counsel under Strickland.

---

[18] Cruz testified that Santiago was her sister-in-law. (T. 225.) Santiago clarified, however, that Cruz's brother fathered Santiago's child, but that Santiago was never married to Cruz's brother. Therefore, Cruz and Santiago are not technically related by blood or marriage.

Rodriguez relies on three cases, but none support either his arguments or his conclusion. First, Petitioner cites <u>Harris v. Artuz</u>, 288 F. Supp. 2d 247 (E.D.N.Y. 2003), <u>aff'd</u>, 100 Fed. Appx. 56, 2004 WL 1303649 (2d Cir. June 14, 2004). In that case, like this one, the petitioner was accused of murder in connection with a shooting, and the sole issue in the case was identification. <u>See</u> 288 F. Supp. 2d at 251. The prosecution presented four identification witnesses, one of whom claimed that he was also shot by the Petitioner. <u>See</u> <u>id.</u> at 252. Medical records revealed, however, that the witness was not in fact shot, he was stabbed, thereby suggesting that the witness was lying. <u>See</u> <u>id.</u> at 253, 258. Trial counsel failed to cross-examine the witness with the records. <u>See</u> <u>id.</u> at 253-54. The habeas court found that this failure to impeach was ineffective, and the Second Circuit affirmed. Unlike this case, however, all four identification witnesses were friends or relatives of the lying witness, and all four told the same inaccurate story. <u>See</u> 100 Fed. Appx. 56, 2004 WL 1303649, at **2. Thus, by impeaching one witness with the inconsistent medical records, "counsel would have simultaneously developed a basis for challenging the veracity of the three other eyewitnesses," <u>id.</u>, leaving no credible testimony upon which the jury could find that defendant was the shooter. This is not the case here. Impeaching Arroyo, Ortiz and Rosario with the DD-5 would not have changed the weight of the remaining testimony, thereby leaving the jury with ample identification testimony upon which to convict Petitioner for Liz's murder.

Second, <u>Eze v. Senkowski</u>, 321 F.3d 110 (2d Cir. 2003), found that trial counsel's failure to emphasize the inconsistencies in the testimony of two child witnesses in a sex abuse case may have been ineffective. <u>See</u> 321 F.3d at 133. The failure to impeach was ineffective only when aggregated with other errors, such as trial counsel's failure to introduce relevant medical evidence or call an expert witness to refute certain testimony, none of which are present in this case. In addition, the child witnesses that Eze's trial counsel failed to impeach were the

only two eyewitnesses to the crime. Therefore, similar to <u>Harris</u>, successful impeachment of the child witnesses would have left the jury with no reliable testimony upon which to convict the defendant. For the reasons explained above, that is not the case here.

Finally, Petitioner cites <u>Lynn v. Bliden</u>, 2004 WL 2181094 (S.D.N.Y. Sept. 24, 2004). In <u>Lynn</u>, the district court held defense counsel's failure to cross-examine a witness with a prior inconsistent statement that he "couldn't recognize" the perpetrator to be ineffective assistance of counsel. The Second Circuit expressly reversed this finding on appeal, however, and cautioned that the ineffectiveness of a trial attorney's failure to impeach an eyewitness must be viewed in light of the other evidence. <u>See</u> 443 F.3d 238, 250-51, 253 (2d Cir. 2006). In this case, the other evidence was sufficient to convict Petitioner for the murder, and therefore the Court finds no prejudice.

### 2. Ineffective Assistance of Appellate Counsel

The Sixth Amendment right to effective assistance of counsel applies with equal force to the appellate stage of a criminal proceeding. <u>See</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 754 (1983). This Circuit applies the two-part <u>Strickland</u> test to claims of ineffective assistance of appellate counsel. <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 488-89 (1986); <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994); <u>Jameson v. Coughlin</u>, 22 F.3d 427, 429 (2d Cir. 1994), <u>cert denied</u>, 513 U.S. 888 (1994). An appellate attorney's failure "to raise every 'colorable' claim suggested by a client" does not amount to ineffective assistance, as an attorney is not required to raise every non-frivolous issue on appeal. <u>See</u> <u>Jones</u>, 463 U.S. at 751-54. Instead, to establish that an appellate attorney's representation was constitutionally inadequate, a petitioner must show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>Mayo</u>, 13 F.3d at 533. As the Second Circuit explained in <u>Mayo</u>, "the district court must examine the trial court record to determine whether appellate counsel failed to

present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised." Id. (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1985)).

   Petitioner now argues that his appellate counsel was ineffective because she only argued that it was error for the trial court to admit the show-up identifications of Cruz and Santiago into evidence, as these identifications were the fruit of a Payton violation.[19] Petitioner now contends that this argument is not as compelling and meritorious as two other arguments that appellate counsel could have raised: trial counsel's failure to impeach the car passengers with the DD-5 and the trial court's failure to charge the jury that Cruz was an accomplice as a matter of law. (Am. Pet. 33.) Petitioner asserts that appellate counsel's decision to advance a weaker argument, and ignore two more meritorious arguments, was the result of incompetence and therefore amounted to ineffective assistance.[20]

   Petitioner fails to establish that appellate counsel's representation was constitutionally inadequate under Strickland.[21] As the Court made clear above, trial counsel's failure to impeach three prosecution witnesses with the DD-5 police report did not change the

---

[19] Considering the devastating testimony provided by Cruz and Santiago against Rodriguez, it certainly appropriate for appellate counsel to argue to exclude their testimony. It represented at least as good a chance as the speculative DD-5 argument and/or the accomplice argument.

[20] Citing an Illinois state court case, see In re A.V., 674 N.E.2d 118 (Ill. App. 1996), Petitioner contends that his appellate counsel is not entitled to the presumption of competence usually afforded attorneys under Strickland because she was a law student at the time of the representation. (Petr.'s Mem. of Law 33-35.) But the Court declines to adopt the view of the Illinois appellate court. Law students representing criminal defendants pursuant to a clinical program are heavily supervised by faculty members, all of whom are practicing attorneys competent in the law. These faculty members guide the students through the brief-writing process and approve all work submitted to the court on behalf of the client. (See Killian Aff., Ex. 21.) With this supervision, there is no reason to believe that the representation provided through law school clinics is any less adequate than that provided by any other criminal defense attorney. Therefore, Petitioner's appellate counsel is entitled to the same deference as an admitted attorney for Strickland purposes.

[21] Again, the state courts denied Petitioner's coram nobis petition arguing ineffective assistance of appellate counsel without any opinion.

outcome of the trial. Even if defense counsel had impeached the testimony of Arroyo, Ortiz and Rosario, the remaining eyewitness testimony was compelling. In fact, one of the eyewitnesses even testified that she gave Rodriguez the gun he then shot. Surely, a reasonable jury could still have found Petitioner guilty of the murder on this testimony alone. It was reasonable for appellate counsel to decide that an ineffective assistance of counsel argument based on defense counsel's failure to impeach with the DD-5 would not be meritorious on appeal. Therefore, her failure to raise this argument was not ineffective.

Appellate counsel's decision not to argue that the trial court erred in failing to charge the jury that Ms. Cruz was an accomplice as a matter of law, and therefore her testimony required corroboration, was also reasonable. Under New York law, a "witness is an accomplice as a matter of law only if the jury could reasonably reach no other conclusion but that he [or she] participated in the offense charged." People v. Caban, 5 N.Y.3d 143, 153 (2005) (quoting People v. Besser, 96 N.Y.2d 136, 147 (2001)). Cruz's only role in the crime was holding Petitioner's gun in her waistband. There is no evidence that Cruz planned or encouraged the shooting itself. The evidence presented at trial did not establish that Cruz undoubtedly "participated in the offense charged," as required by Caban. Indeed, it showed the opposite. Rodriguez had given Cruz the gun to carry. At the time of the incident, she refused his request for the gun because she was afraid he would shoot. He took the gun anyway and shot into the passenger vehicle. (T. 233-235; T. 242-243.) In these circumstances, it was reasonable for appellate counsel to believe that attacking the trial court's decision to deny an accomplice charge would have little success on appeal. By choosing to focus on a single ground for appeal, rather than numerous weaker grounds, appellate counsel advocated for her client in an effective manner. Her decision not to dilute her Fourth Amendment argument with additional, potentially baseless arguments was

sound appellate strategy.  Accordingly, Petitioner did not receive ineffective assistance by his appellate counsel.

### 3. Prosecutorial misconduct

#### (a) prosecutor's representation that the DD-5 only had one page

In his original <u>pro</u> <u>se</u> petition, Petitioner argued that the prosecutor committed gross misconduct when he misrepresented to the Court and the jury that the DD-5 did not contain a second page, in order to hide potentially damaging evidence. This argument has no merit. First, during the conversation in question, it is not at all clear that the prosecutor misrepresented the contents of the police report; instead, the prosecutor merely indicated that the statement read to refresh the witness's recollection was contained wholly on the first page of the report. Second, even if the prosecutor did misrepresent the contents of the report, there is no evidence that this misrepresentation was intentional.  While Petitioner alleges, in conclusory fashion, that the prosecutor "suppress[ed]" this information, he is speculating.  There is no actual evidence from which the Court could find that the prosecutor intentionally misrepresented the lack of a second page.  (Orig. Pet. at 5-E).  The prosecution had already turned over a copy of the DD-5 report to the defense, as evidenced by the fact that defense counsel asked Arroyo to read from the report; there is no reason to believe that the prosecution was attempting to hide potentially damaging information.  The Court can discern no impropriety on the part of the prosecutor that would justify habeas relief.

#### (b) introduction of the photograph

Petitioner also argues in his original <u>pro</u> <u>se</u> petition that the prosecutor improperly admitted to the jury a photograph that had previously been suppressed by the court as the fruit of an illegal arrest.   Petitioner claim refers to a photograph taken at the precinct immediately after Petitioner's arrest, which showed Petitioner wearing large amounts of gold jewelry on his hands.

At trial, the prosecution presented the photograph to the jury to corroborate the witness' testimony that the shooter wore lots of gold jewelry. (T. 578.) Petitioner now claims that entering this photograph into evidence, despite the prior suppression ruling, was prosecutorial misconduct and violated the Fourth and Fourteenth Amendments to the U.S. Constitution.

Petitioner's claim is without merit. Most basically, Petitioner's argument turns on the erroneous premise that the photograph was originally suppressed by the trial court. The trial court suppressed only the photograph allegedly seized from Petitioner's apartment, not every photograph taken of the defendant. (W. 190; T. 5.) Furthermore, when asked by the court whether the defense objected to admission of the photograph into evidence, defense counsel failed to make any mention of the Fourth Amendment or the prior suppression ruling, instead objected on the ground that no connection had been made. (See T. 578-79.) There is absolutely no basis upon which the Court could find that the prosecution's successful admission of the photograph into evidence constitutes prosecutorial misconduct.

Regardless, this court may not entertain Petitioner's Fourth Amendment claim at this juncture. Claims premised on violations of the Fourth Amendment are cognizable on habeas review only if the state denied the petitioner a full and fair opportunity to litigate his claim. See Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991) (citing Stone v. Powell, 428 U.S. 465 (1976)). A petitioner lacks a full and fair opportunity to litigate a claim only when (1) no state procedures exist by which petitioner can redress the alleged Fourth Amendment violations; or (2) such procedures do exist but petitioner was unable to take advantage of them because of certain deficiencies in the underlying state process. See Daily v. New York, 388 F.Supp.2d 238, 249 (SDNY 2005) (citing Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977))). Neither condition is satisfied in this case. Petitioner had a full and fair opportunity to raise his Fourth Amendment claim. In fact, defense

counsel had four separate opportunities to raise this Fourth Amendment claim—a pre-trial motion to suppress; immediately prior to trial; when the photograph was moved into evidence; and on appeal. (W. 190; T. 4-5, 578-80.)  Petitioner's failure to fully avail himself of these processes does not render them inadequate.

### 4. trial court's refusal to suppress show-up identifications

Petitioner's final argument in support of habeas relief is that the trial court should have suppressed the precinct show-up identifications by Cruz and Santiago.  Petitioner alleges two different constitutional violations arising from the trial court's decision: (1) violation of the Fourth Amendment, because the show-up identifications were tainted by Petitioner's illegal warrantless arrest; and (2) violation of the Fourteenth Amendment, because the show-up identifications were unduly suggestive.  The Court will address these two arguments separately.

### (a)  Fourth Amendment

As previously discussed, Fourth Amendment claims are not ordinarily cognizable on habeas petitions.  This rule applies to claims that evidence—physical evidence, confessions, or, as in the instant case, identification evidence—should have been suppressed as tainted by an illegal arrest.  See Cardwell v. Taylor, 461 U.S. 571 (1983); Chavis v. Henderson, 638 F.2d 534 (2d Cir. 1980).  Petitioner had a full and fair opportunity to raise this issue at a pre-trial hearing, at trial and on appeal.  See People v. Rodriguez, 236 A.D.2d 332 (1st Dep't 1997).  There is no evidence that the processes available to Petitioner were deficient or tainted in any way.  Thus, Petitioner's Fourth Amendment rights have been amply satisfied.

### (b) Fourteenth Amendment Due Process

The Supreme Court has cautioned that the one-on-one identification procedures may be unduly suggestive because they focus a witness's attention on the accused in a manner that increases the likelihood of a mistaken identity.  See Stovall v. Denno, 388 U.S. 293, 301-02

(1967), abrogated on other grounds by Griffith v. Kentucky, 479 U.S. 314 (1987); Neil v. Biggers, 409 U.S. 188, 198 (1972). Admitting evidence derived from suggestive identification procedures violates the due process rights of the accused. Neil, 409 U.S. at 198. Therefore, the trial court must afford the defendant an opportunity to challenge all out-of-court identifications prior to trial, and must suppress them if it appears that the procedures used to obtain the identification were unnecessarily suggestive and conducive to irreparable mistaken identity. Id.

While "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," the use of evidence from a show-up identification will not violate due process if it is otherwise reliable. Stovall v. Denno, 388 U.S. at 302; see also Neil, 409 U.S. at 198 (1972). As both the trial court and the Appellate Division explained, the show-up identifications of Petitioner by Cruz and Santiago were reliable because both witnesses knew Petitioner prior to the shooting, thereby minimizing any risk of misidentification.[22] See People v. Rodriguez, 236 A.D.2d 332, 332 (1st Dep't 1997). Therefore, the admission of these show-up identifications at trial was not erroneous. The Appellate Division also found that "any error in the trial court's ruling was harmless beyond a reasonable doubt." Id. In light of the other evidence implicating Petitioner, including positive in-court identifications by other witnesses, the Appellate Division's decision was not unreasonable. As such, Petitioner's due process claim is denied.

---

[22] See supra note 4.

## IV. CONCLUSION

For the foregoing reasons, Petitioner Wilson Rodriguez's request for a writ of

habeas corpus pursuant to 28 U.S.C. §2254 is DENIED and the Petition is DISMISSED.

Petitioner has not made a substantial showing of the denial of a constitutional right, and the

Court will not issue a certificate of appealability. 28 U.S.C. § 2253(c)(2). The Court certifies

that any appeal from this Order would not be taken in good faith. 28 U.S.C. § 1915(a)(3). The

Clerk of the Court is directed to enter judgment and close out this case.

Dated: New York, NY
       July 28, 2006

SO ORDERED

PAUL A. CROTTY
United States District Judge

Copies mailed to:

Abraham Abramovsky
140 West 62nd Street
New York, NY 10023


Nancy D. Killian
Office of the District Attorney
Bronx County
215 East 161st Street
Bronx, NY 10451